UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X   Case No.: 10 Cv. 7306 (PAC)

JENINE CLARK as the Administrator of the Estate :
Of MICHAEL FOX a/k/a BRANDON JACKSON,  :
and JENINE CLARK as Mother and Natural     :
Guardian of BRANINE JACKSON and BRIANNA :
JACKSON, the Infant Children of BRANDON    :
JACKSON,                                   :     **AMENDED COMPLAINT**
                          Plaintiffs,    :
                                     :
        -against-                  :     **TRIAL BY JURY**
                                   :     **DEMANDED**

COMMISSIONER BRIAN FISCHER, New York   :
Department of Correctional Services;        :
SUPERINTENDENT PATTY NELSON;        :
SUPERINTENDENT  RONALD MOSCICKI;    :
DR. LESTER WRIGHT, M.D.; JOHN MCPHILIPS,:
 M.D.; CORRECTIONS OFFICER DANIEL    :
BUNNEY; CORRECTIONS OFFICER JAMES   :
BLYTH; CORRECTIONS OFFICER PAUL PAPE; :
CORRECTIONS OFFICER ROBERT CADE;    :
CORRECTIONS OFFICER SERGEANT DAVID  :
MILLER; CORRECTIONS OFFICER BRIAN    :
KEENAN; CORRECTIONS OFFICER "PIERCE", :
employed at Summit Correctional Facility;    :
PATRICIA A. FEDERICO; JAMES W. MISKINIS; :
CATHY JO SHUMAN; SLAVA MILOV;      :
"DR.MAKRAM", M.D., employed at Ulster   :
Correctional Facility;  "J. COLVIN" REGISTERED :
NURSE employed at Lakeview Correctional   :
Facility; "L. WILCOX", NURSE PRACTITIONER :
employed at Lakeview Correctional Facility;  :
"S. MOONEY", CORRECTIONS COUNSELOR :
employed at Summit Correctional Facility;    :
CORRECTIONS COUNSELOR MICHAEL    :
ILLELLA; CORRECTIONS COUNSELOR     :
ANGEL L. JUSTINIANO; JOHN DOE 1, M.D., :
employed at Lakeview Correctional Facility;  :
JOHN DOE 2, M.D. employed at Lakeview   :
Correctional Facility;                :
                                   :
All In Their Individual Capacities,       :
                         Defendants.   :
------------------------------------------------------------X

1

Plaintiffs, complaining of the defendants, by their attorney MORTON BUCKVAR, allege as follows:

## PRELIMINARY STATEMENT

1.      This is an action for monetary relief, including punitive damages and attorneys fees and costs, to redress defendants' violation of federally protected rights and satisfy plaintiffs' state common-law claims.

2.      This action arises under the Eighth Amendment of the United States Constitution; the Fourteenth Amendment of the United States Constitution; the Civil Rights Act of 1871, 42 U.S.C. §§ 1983, 1988, 1985(3); New York Estates, Powers and Trusts Law Section 5-4.3; and under the statutes and common law of the State of New York.

3.      All defendants named herein are sued in their individual capacities.

4.      Plaintiffs' claims under 42 U.S.C. §§ 1983, 195, 1988 and the U.S. Constitution are claims which this Court are required to hear as mandated by  the Supremacy Clause of the United States Constitution.

## PARTIES

5.      The DECEDENT, MICHAEL FOX a/k/a BRANDON JACKSON (hereinafter DECEDENT FOX) was an inmate participating in the New York State Department of Correctional Services Shock Incarceration Program ("Shock Incarceration Program" hereafter) at Summit Correctional Facility.

6.      At the time of his death, DECEDENT FOX was 29 years old, productive, and in possession of all his faculties.

7.      DECEDENT FOX is survived by his two children BRANINE JACKSON and BRIANNA JACKSON, who were dependent upon him for support, maintenance and guidance, and who have been damaged by his death.

8.      Plaintiff JENINE CLARK (hereinafter "CLARK") is the duly appointed Administrator of the Estate of MICHAEL FOX a/k/a BRANDON JACKSON.

9.      CLARK has necessarily paid for DECEDENT FOX's funeral, has incurred other expenses in connection with DECEDENT's burial, and will necessarily incur expenses in the settlement of the DECEDENT's estate.

10.     Prior to the commencement of this action, the Surrogate's Court of Bronx County, New York, issued to CLARK letters of administration upon the estate of DECEDENT FOX, who died a resident of Bronx County, New York.

11.     CLARK has qualified as the administrator of DECEDENT FOX's estate and is authorized to maintain the actions contained herein.

12.     CLARK files this lawsuit in both her individual capacity and her representative capacity on behalf of the Estate of BRANDON JACKSON.

13.     BRANINE JACKSON and BRIANNA JACKSON are the infant children of DECEDENT FOX, and are residents of the County of Bronx, State of New York.

14.     JENINE CLARK is the mother and legal guardian of both BRANINE JACKSON and BRIANNA JACKSON, and is a resident of the County of Bronx, State of New York. In her capacity as mother and legal guardian, JENINE CLARK also files this lawsuit on behalf of BRANINE JACKSON and BRIANNA JACKSON.

15.     Defendant BRIAN FISCHER (""FISHER") was at all relevant times the Commissioner of the New York State Department of Corrections whose official

residence and main office is in the city and County of Albany, New York. At all relevant times he was acting under color of state law. He is being sued in his individual capacity.

16.     Defendant PATTY NELSON ("NELSON") was at all relevant times the Superintendent of Summit Correctional Facility and acting under color of state law. She is being sued in her individual capacity.

17.     Defendant RONALD MOSCICKI, ("MOSCICKI") was at all relevant times the Superintendent of Lakeview Correctional Facility and acting under color of state law. He is being sued in his individual capacity.

18.     Defendant LESTER WRIGHT, MD, ("WRIGHT") was at all relevant times the chief medical officer and a deputy commissioner of the New York State Department of Correctional Services, and acting under color of state law. He is being sued in his individual capacity.

19.     Defendant JOHN MCPHILIPS, M.D. ("MCPHILLIPS") was at all relevant times a medical doctor contracted by the State of New York, working at Hale Creek Correctional Facility, and acting under color of state law. His or her duties included screening candidates for the Shock Incarceration Program, monitoring the health of and providing treatment to those inmates who participated in the Shock Incarceration Program. He is being sued in his individual capacity.

20.     Defendant   CORRECTIONS   OFFICER   DANIEL   BUNNEY ("BUNNEY") was at all relevant times a corrections officer employed by the State of New York, working at Summit Correctional Facility, and acting under the color of state law. His duties included operating the DOCS Shock Incarceration Program and supervising inmates in that program. He is being sued in his individual capacity.

21.     Defendant CORRECTIONS OFFICER BRIAN BLYTH ("BLYTH") was at all relevant times a corrections officer employed by the State of New York, working at Summit Correctional Facility, and acting under the color of state law. His duties included operating the DOCS Shock Incarceration Program and supervising inmates in that program. He is being sued in his individual capacity.

22.     Defendant CORRECTIONS OFFICER PAUL PAPE ("PAPE"), was at all relevant times a corrections officer employed by the State of New York, working at Summit Correctional Facility, and acting under the color of state law. He is being sued in his individual capacity.

23.     Defendant CORRECTIONS OFFICER ROBERT CADE ("CADE") was at all relevant times a corrections officer employed by the State of New York, working at Summit Correctional Facility, and acting under the color of state law. His duties included operating the DOCS Shock Incarceration Program and supervising inmates in that program. He is being sued in his individual capacity.

24.     Defendant CORRECTIONS SERGEANT DAVID MILLER ("MILLER"), was at all relevant times a corrections officer employed by the State of New York, working at Summit Correctional Facility, and acting under the color of state law. His duties included operating the DOCS Shock Incarceration Program and supervising inmates in that program. He is being sued in his individual capacity.

25.     Defendant CORRECTIONS OFFICER KEENAN ("KEENAN") was at all relevant times a male corrections officer employed by the State of New York, working at Summit Correctional Facility, and acting under the color of state law. His duties

included operating the DOCS Shock Incarceration Program and supervising inmates in that program. He is being sued in his individual capacity.

26.     Defendant CORRECTIONS OFFICER PIERCE ("PIERCE"), was at all relevant times a corrections officer employed by the State of New York, working at Summit Correctional Facility, and acting under the color of state law. His duties included operating the DOCS Shock Incarceration Program and supervising inmates in that program. He is being sued in his individual capacity.

27.     Defendant PATRICIA FEDERICO, REGISTERED NURSE (""FEDERICO") was at all relevant times a female nurse employed by the State of New York, working at Summit Correctional Facility, and acting under the color of state law. Her duties included monitoring the health of inmates in the DOCS Shock Incarceration Program and administering first aid to those inmates in need of medical care. She is being sued in her individual capacity.

28.     Defendant JAMES W. MISKINIS, REGISTERED NURSE ("MISKINIS") was at all relevant times a male nurse employed by the State of New York, working at Summit Correctional Facility, and acting under the color of state law. His duties included monitoring the health of inmates in the DOCS Shock Incarceration Program and administering first aid to those inmates in need of medical care. He is being sued in his individual capacity.

29.     Defendant CATHY JO SHUMAN, REGISTERED NURSE ("SHUMAN") was at all relevant times a nurse employed by the State of New York, working at Ulster Correctional Facility, and acting under the color of state law. She is being sued in their individual capacity.

30.     Defendant SLAVA MILOV , PHYSICIAN ASSISTANT ("""MILOV")
was at all relevant times a physician assistant employed by the State of New York,
working at Ulster Correctional Facility, and acting under the color of state law. She is
being sued in their individual capacity.

31.     Defendant "Dr. MAKRAM", MEDICAL DOCTOR ("MAKRAM") was
at all relevant times a medical doctor employed by the State of New York, working at
Ulster Correctional Facility, holding the title Facilities Health Services Director and
acting under the color of state law. He or she is being sued in their individual capacity.

32.     Defendant "J. COLVIN", REGISTERED NURSE ("COLVIN"), was at all
relevant times a nurse at Lakeview Correctional Facility, and acting under the color of
state law. His or her duties included screening candidates for the DOCS Shock
Incarceration Program and monitoring the health of those inmates who participated in the
DOCS Shock Incarceration Program. He or she is being sued in their individual capacity.

33.     Defendant "L.WILCOX", NURSE PRACTITIONER, was at all relevant
times a nurse at Lakeview Correctional Facility, and acting under the color of state law.
His or her duties included screening candidates for the DOCS Shock Incarceration
Program and monitoring the health of those inmates who participated in the DOCS Shock
Incarceration Program. He or she is being sued in their individual capacity.

34.     Defendant CORRECTIONS COUNSELOR "S. MOONEY", was at all
relevant times a corrections counselor employed by the State of New York, working at
Summit Correctional Facility, and acting under the color of state law. His duties included

operating the DOCS Shock Incarceration Program and supervising inmates in that program. He is being sued in his individual capacity.

35.     Defendant MICHAEL ILLELLA, CORRECTIONS COUNSELOR, was at all relevant times a counselor employed by the New York State Department of Corrections and acting under color of state law at either Ulster Correctional Facility or Lakeview Correctional Facility. His duties included enrolling inmates into the DOCS Shock Incarceration Program. He is being sued in his individual capacity.

36.     Defendant ANGEL L. JUSTINIANO, CORRECTIONS COUNSELOR, was at all relevant times a counselor employed by the New York State Department of Corrections and acting under color of state law at either Ulster Correctional Facility or Lakeview Correctional Facility. His duties included enrolling inmates into the DOCS Shock Incarceration Program. He is being sued in his individual capacity.

37.     Defendant JOHN DOE 1, M.D. was at all relevant times a medical doctor employed by the State of New York, working at Lakeview Correctional Facility, and acting under color of state law. His or her duties included serving on the Shock Incarceration Selection Committee, screening candidates for the DOCS Shock Incarceration Program, and monitoring the health of those inmates who participated in the DOCS Shock Incarceration Program. He or she is being sued in their individual capacity.

38.     Defendant JOHN DOE 2, M.D. was at all relevant times a medical doctor employed by the State of New York, working at Lakeview Correctional Facility, and acting under color of state law. His or her duties included serving on the Shock Incarceration Selection Committee, screening candidates for the DOCS Shock

Incarceration Program, and monitoring the health of those inmates who participated in the DOCS Shock Incarceration Program. He or she is being sued in their individual capacity.

## COMMON FACTUAL ALLEGATIONS

39.     In 2009 DECEDENT FOX pled guilty in New York County Supreme Court to Criminal Possession of a Controlled Substance in the Third Degree and Criminal Sale of a Controlled Substance in the Third Degree. He was sentenced to 2 years of incarceration with a recommendation by the Court that DECEDENT undergo the CASAT program while incarcerated.

36.     On or about June 23, 2009 DECEDENT FOX was transferred from the custody of New York City Department of Correction to New York State Department of Correctional Services (hereinafter "DOCS") at Ulster Correctional Facility, located in Ulster County, New York. (see Commission on Corrections Report attached hereto and made a part hereof as EXHIBIT A)

37.     From approximately June 23, 2009 until his death on August 14, 2009, DECEDENT FOX had serious medical problems which the defendants were or should have been aware of, including, but not limited to: diabetes, asthma, obesity, healed hip fractures with pinning, and cardiac problems.

38.     From approximately June 23, 2009 until his death on August 14, 2009, DECEDENT FOX's serious medical needs were ones that had been previously diagnosed by a physician as requiring treatment and were so obvious that even a lay person would easily recognize the precariousness of DECEDENT FOX's health.

<u>Course of Decedent Fox's Incarceration</u>

40.     After DECEDENT FOX was received at Ulster Correctional Facility by DOCS at approximately 1:00 p.m., June 23, 2009, DECEDENT FOX sought medical care and was seen by Registered Nurse CHRIS FRANZA and Physician Assistant "HELL".

41.     At that time FRANZA and HELL noted DECEDENT FOX complained of asthma symptoms and took Albuterol; treatment was withheld until after a physical exam later that day.

42.     Later on June 23, 2009, defendant SHUMAN completed a full medical history which recorded that DECEDENT FOX was diagnosed with asthma as a child and had past hospitalizations due to asthma; SHUMAN also recorded that Fox had past surgery on his right shoulder, a fracture and surgical repair of his right hip with open reduction internal fixation pins in place, and past fractures of fingers both wrists, and ankles.

43.     After SHUMAN's medical history was completed, an asthma assessment of DECEDENT FOX was done later that day by SHUMAN at approximately 7 p.m.

44.     At that time SHUMAN documented a childhood diagnosis of asthma, no history of asthma hospitalization, a positive history of using steroids for asthma control, and a current prescription for Albuterol MDI for asthma control.

45.     Additionally, SHUMAN recorded that DECEDENT Fox's last asthma attack occurred in 2004 and that he had current peak flow rates of 800, 850, and 900.

46.     At approximately 8:55 a.m. the next day, June 24, 2009, DECEDENT FOX again appeared at sick call complaining of asthma symptoms.

47.     At that time DECEDENT FOX was seen by defendant MILOV who recorded a diagnosis of mild intermittent asthma, noted that patient education was given, and told DECEDENT to continue to use his Albuterol MDI inhaler.

48.     Later the same day, June 24, 2009, defendant MILOV examined DECEDENT FOX and completed his DOCS Medical Classification

49.     During that exam, MILOV noted that the DECEDENT had bilateral hip surgery at the age of 12, that he was obese and had mild intermittent asthma. DECEDENT FOX was labeled medical classification "3".

50.     At the same time MILOV completed DECEDENT FOX's Medical Classification, she also formulated an Asthma Rescue Treatment Plan which recorded DECEDENT's best peak flow at 900 and diagnosed him as having Mild Intermittent Asthma which was being treated with Albuterol. .

51.     At about 6:20 a.m. on July 2, 2009, FOX reported to sick call stating that he had been wheezing a great deal lately, suffered from asthma symptoms, and had been coughing.

52.     At that time Registered Nurse TERRY GORTON recorded that FOX's Albuterol inhaler was almost empty and requested a physician's assistant to prescribe more Albuterol; GORTON told DECEDENT to return to sick call if his condition did not improve.

53.     On or about 7:15 a.m. of the same day, July 2, 2009, Physician Assistant LINDA SPYKER-OLES prescribed DECEDENT FOX a five month supply of Albuterol which was subsequently provided to him by the DOCS pharmacy.

Application and Screening into the Shock Incarceration Program

54.     On July 8, 2009, defendants ILLELLA and JUSTINIANO solicited and encouraged inmates to enroll in the DOCS Shock Incarceration Program.

55.     ILLELLA and JUSTINIANO told DECEDENT FOX that the DOCS Shock Incarceration Program would vastly reduce his sentence.

56.     ILLELLA and JUSTINIANO further represented to DECEDENT FOX that the program was safe regardless of the physical condition of the participant, and that participants could complete the program regardless of their physical condition.

57.     DECEDENT FOX was told by ILLELLA and JUSTINIANO that he could no longer participate in the CASAT drug treatment program and instead must complete the DOCS Shock Incarceration Program instead.

58.     Despite the fact that the sentencing Judge had recommended that DECEDENT FOX be to the drug treatment program CASAT, DECEDENT FOX was coerced by ILLELLA and JUSTINIANO into the DOCS Shock Incarceration Program.

59.     On July 8, 2009 ILLELLA and JUSTINIANO coerced, pressured, and forced DECEDENT FOX to enroll in the DOCS Shock Incarceration Program contrary to and in violation of the lawfully entered order of the New York State Supreme Court.

60.     At that time, ILLELLA and JUSTINIANO completed a DOCS Shock Incarceration Program Suitability Screening form which allowed them specify whether DECEDENT FOX's medical status would require reasonable accommodation; both ILLELLA and JUSTINIANO screened DECEDENT FOX's medical status as suitable for the program, without any accommodation.

61.     ILLELLA and JUSTINIANO unlawfully and in violation of the DECEDENT's Fourteenth Amendment right to Due Process of Law enrolled DECEDENT FOX into the DOCS Shock Incarceration Program instead of CASESAT.

62.     On July 8, 2009, after DECEDENT FOX enrolled in the DOCS Shock Incarceration Program, he was medically screened for entry into the program by defendant MAKRAM.

63.     MAKRAM examined DECEDENT FOX at that time and determined that DECEDENT FOX was medically eligible for the DOCS Shock Incarceration Program, noting that DECEDENT FOX had no asthma since 1996, no Albuterol use and no evidence of diabetes or hypertension.

64.     Despite DECEDENT FOX's serious medical needs and multiple illnesses and injuries, including concurrent asthma symptoms and documented Albuterol use, MAKRAM cleared DECEDENT FOX for entrance into the DOCS Shock Incarceration Program.

65.     On or about July 9, 2009, DECEDENT FOX was transported from Ulster Correctional Facility to Lakeview Correctional Facility, located in Chautauqua County, State of New York. (EXHIBIT A)

66.     When DECEDENT FOX arrived at Lakeview Correctional Facility, defendant COLVIN performed an intrasystem transfer health-screening, in which COLVIN noted DECEDENT FOX was medically classified as 3, suffering from asthma, had bilateral hip screws, and he was currently taking Albuterol for asthma control.

67.     At the same time or shortly thereafter on July 9, 2009 COLVIN and defendant WILCOX performed a health screening for inclusion into the DOCS Shock Incarceration Program.

68.     COLVIN and WILCOX documented that DECEDENT FOX suffered from asthma, had a Peak Flow of 720, and had no recent Albuterol MDI use; both defendants then documented that DECEDENT FOX was recommended for the DOCS Shock Incarceration Program.

69.     In approving DECEDENT FOX's medical suitability for the DOCS Shock Incarceration Program, neither COLVIN nor WILCOX checked his past medical records, charts, or health reports.

70.     In approving DECEDENT FOX's medical suitability for the DOCS Shock Incarceration Program, neither COLVIN nor WILCOX checked DOCS electronic pharmacy records to determine whether DECEDENT FOX was currently prescribed medications such as Albuterol.

71.     While at Lakeview Correctional Facility, DECEDENT FOX's application to the Shock Incarceration Program was reviewed by JOHN DOE 1 and JOHN DOE 2, members of the Lakeview Shock Incarceration Selection Committee.

72.     Defendants JOHN DOE 1, JOHN DOE 2, COLVIN, and WILCOX had the authority to order DECEDENT FOX to complete the Shock Incarceration Program at Lakeview Correctional Facility

73.     DECEDENT FOX remained at Lakeview Correctional Facility when on July 13, 2009 he presented at sick call to Registered Nurse "R. Wittrock", complaining of breathing difficulties, allergy symptoms, and requesting a refill of his Albuterol MDI.

74.     At that time Nurse Wittrock gave DECEDENT FOX 10 tablets of Chlortrimeton for his allergy symptoms and prescribed him a refill of his Albuterol inhaler.

75.     When DECEDENT FOX received his Albuterol inhaler prescribed by Nurse Wittrock, its label did not contain the DECEDENT FOX's name, DIN number, or other indentifying information.

76.     Four days later on July 17, 2009, DECEDENT FOX appeared at sick call again, this time complaining of allergies and asthma symptoms.

77.     At that time defendant WILCOX examined DECEDENT FOX and prescribed Claritin D; WILCOX also provided DECEDENT FOX with twelve Medicidin D tablets and analgesic balm.

78.     Three days later on July 20, 2009, DECEDENT FOX presented at sick call to Registered Nurse "A. GIMLY", complaining of a head cold.

79.     GIMLY documented DECEDENT FOX's complaints and gave him Claritin.

80.     The next day, July 21, 2009, DECEDENT FOX once again presented at sick call complaining of a head cold, this time before Registered Nurse "C. CHELTON".

81.     At that time CHELTON documented DECEDENT FOX suffered from nasal congestion and was taking Claritin.

82.     Three days later on July 24, 2009, DECEDENT FOX presented to sick call again, complaining of breathing problems and a chest cold for the two days prior.

83.     At that time Registered Nurse "C. WEITZ" documented DECEDENT FOX's complaints and observed that he had a loose, non-productive cough.

15

84.     On July 28, 2009, DECEDENT FOX was transferred to from Lakeview Correctional Facility to Ulster Correctional Facility.

85.     Two days later on July 30, 2009 DECEDENT FOX was transferred from Ulster Correctional Facility to Summit Correctional Facility to begin the DOCS Shock Incarceration Program.

<u>Summit Correctional Facility Shock Incarceration Program</u>

86.     The next morning, July 31, 2009, DECEDENT FOX had a health screening for intrasystem transfer preformed at Summit Correctional Facility by defendant MISKINIS.

87.     During the health screening MISKINIS documented that DECEDENT FOX suffered from obesity, asthma, had internal bilateral pins in his hip, currently used Albuterol to control his asthma, and was taking Claritin.

88.     During the exam MISKINIS measured DECEDENT FOX's Peak Flow at 570, a level about 37 percent below the Peak Flow levels measured at Ulster Correctional Facility and labeled on DECEDENT FOX's Asthma Rescue Treatment Plan by MILOV.

89.     Nevertheless, at that time MISKINIS documented his belief that DECEDENT FOX was abusing his Albuterol MDI, as he had used almost three inhalers since the previous April.

90.     At no time during the health screening did MISKINIS ask DECEDENT FOX why he was using so much Albuterol, nor did he review DECEDENT FOX's previous medical records or Asthma Rescue Treatment Plan.

91.     DECEDENT FOX began the DOCS Shock Incarceration Program at Summit Correctional Facility and on August 3, 2009 at about 7:20 a.m. he presented at

sick call complaining of asthma symptoms including shortness of breath and indicated that his Albuterol MDI was empty.

92.    Defendant FEDERICO examined DECEDENT FOX at that time and documented that he had just completed a Physical Training ("PT") run.

93.    At that time, FEDERICO measured DECEDENT FOX's Peak Flow at 500, about 45 percent less than the Peak Flow of 900 recorded on his Asthma Rescue Treatment Plan by MILOV five weeks before.

94.    Notwithstanding DECEDENT FOX's medical history and significantly reduced Peak Flow, FEDERICO counseled him that shortness of breath was to be expected after a PT run and took no further action.

95.    Immediately after FEDERICO examined DECEDENT FOX on the morning of August 3, 2009, MISKINIS did so as well.

96.    At that time MISKINIS accused DECEDENT FOX of abusing and overusing his Albuterol MDI; DECEDENT FOX insisted that he needed to have an Albuterol MDI to participate in PT exercises and runs.

97.    Ignoring DECEDENT FOX's medical history, significantly reduced Peak Flow, and complaints of breathing difficulty, MISKINIS documented that that DECEDENT FOX had no asthmatic signs or symptoms and scheduled a doctor's appointment for August 5, 2009.

98.    MISKINIS further documented that DECEDENT FOX's Peak Flow of 500 was good, notwithstanding that it was about 45 percent less than the Peak Flow of 900 recorded on DECEDENT FOX's Asthma Rescue Treatment Plan.

99.     On the morning of August 5, 2009 MISKINIS documented information for DECEDENT FOX's pending doctor's appointment.

100.    At that time MISKINIS documented that DECEDENT FOX had a history of asthma and complained of shortness of breath during physical exercise.

101.    MISKINIS further referenced DECEDENT FOX's Peak Flow of 570 from July 31, 2009, noted that DECEDENT FOX was using Albuterol MDI and Claritin D, and that DECEDENT FOX needed a new prescription for Albuterol.

102.    At about 11:00 a.m. on August 5, 2009 DECEDENT FOX was transported to Hale Creek Correctional Facility for a medical appointment with defendant MCPHILLIPS.

103.    While at Hale Creek Correctional Facility, a nurse recorded DECEDENT FOX's Peak Flow rates at 360, 380, and 370. These Peak Flow rates were respectively about 60 percent, 58 percent, and 59 percent below the Peak Flow of 900 recorded on DECEDENT FOX's Asthma Rescue Treatment Plan.

104.    After examining DECEDENT FOX, reviewing his medical history, seeing his dangerously reduced Peak Flow rates, and referencing DECEDENT FOX's Asthma Rescue Treatment Plan, MCPHILLIPS documented that DECEDENT FOX had no current asthmatic signs or symptoms.

105.    At that time MCPHILLIPS made no documentation as the whether DECEDENT FOX's symptoms were getting worse, better, or were stable.

106.    At that time MCPHILLIPS never asked DECEDENT FOX why he was using such a large amount of Albuterol nor did MCPHILLIPS address FOX's dangerously reduced Peak Flow rates.

107.     After MCPHILLIPS examined DECEDENT FOX he diagnosed FOX as having mild intermittent asthma, but refused to renew the prescription for Albuterol or issue a new one for anti-inflammatory medication.

108.     After DECEDENT FOX's medical appointment with MCPHILLIPS, he was transported back to Summit Correctional Facility where he rejoined his inmate group and participated in PT exercises.

109.     Later that same day, August 5, 2009, while DECEDENT FOX was participating in PT exercises, defendant BUNNEY confiscated DECEDENT FOX's Albuterol inhaler.

110.     At that time DECEDENT FOX's Albuterol MDI contained a blank label with no name, DIN number, date of dispensing, or signature of the issuing medical provider.

111.     At that time there were at least two other inmates in DECEDENT FOX's group or "platoon" that also suffered asthma and possessed Albuterol MDI's to control their asthma; like DECEDENT FOX's Albuterol MDI, their own MDI's contained a blank label with no name, DIN number, date of dispensing, or signature of the issuing medical provider.

112.     At that time all of the Corrections Officers, including BUNNEY, who managed and directed DECEDENT FOX's platoon knew that other inmates possessed and used Albuterol MDI's with no name or label on them.

113.     However, despite this knowledge only DECEDENT FOX was singled out and had his Albuterol MDI confiscated.

114.    Later that same day DECEDENT FOX notified defendant KEENAN that his Albuterol MDI had been confiscated by BUNNEY and that he needed the medication to treat his asthma.

115.    After speaking with DECEDENT FOX, KEENAN looked for the Albuterol inhaler in the officer's desk but could not find it.

116.    After searching for the Albuterol inhaler, KEENAN contacted MISKINIS about DECEDENT FOX's Albuterol MDI.

117.    At that time MISKINIS told KEENAN that DECEDENT FOX had no need for an Albuterol MDI and that none would be provided; KEENAN reported this to DECEDENT FOX.

118.    The next day, August 6, 2009, DECEDENT FOX sought and was granted an appointment with defendant MOONEY, a Corrections Counselor at Summit Correctional Facility.

119.    During the appointment DECEDENT FOX informed MOONEY about his health problems and confiscated inhaler.

120.    At that time DECEDENT FOX told MOONEY that he was afraid that continuing PT exercise would result in his injury or death.

121.    DECEDENT FOX's fears were centrally concerned with the fact that he was overweight and suffered from asthma, yet he had no medication or other reasonable accommodation available to him.

122.    At that time MOONEY documented that DECEDENT FOX was cooperative and nervous about completing the PT exercises the Shock Incarceration Program requires.

123. MOONEY further directed DECEDENT FOX to report any incidents to corrections officers or medical personnel; this direction was made in spite of the fact that DECEDENT FOX reported to MOONEY that he had tried to do exactly that in the previous three days, yet no medical personnel or corrections officers had rendered assistance.

124. During the appointment, MOONEY and DECEDENT FOX discussed a temporary release from the Shock Incarceration Program, including participation in the DOCS Temporary Release Program.

125. Despite DECEDENT FOX's fears and apprehension, MOONEY told FOX he would remain in the Shock Incarceration Program at Summit Correctional Facility.

<u>Decedent Fox's Collapse and Death</u>

126. On a typical morning in the Shock Incarceration Program, the participants begin their day between 6:00 a.m. and 7:30 a.m. with about 45 minutes of Physical Training exercises and then run of approximately one mile; afterwards, the inmates clean up, eat breakfast at approximately 8:00 a.m., and then attend various training and counseling classes until 12:00 p.m.

127. On the morning of August 12, 2009, the Corrections Officers scheduled what is known as the "Captain's Drill", also called the "Knucklehead Drill".

128. The Captain's Drill is an extended period of intensive exercise and running that took place after breakfast on August 12, 2009, between 9:30 a.m. and 12:00 p.m.

129.    The Captain's Drill consists of 90 minutes of Physical Training exercises followed by a three-mile run, all in addition to the regular exercises and run the inmates normally perform.

130.    On the morning of August 12, 2009, DECEDENT FOX completed the usual PT exercise and running between the approximate hours of 6:00 a.m. and 7:30 a.m.

131.    At approximately 7:45 a.m. on August 12, 2009 DECEDENT FOX presented at sick call to FEDERICO.

132.    At that time DECEDENT FOX complained to FEDERICO of an injury to his right ankle.

133.    At about 9:30 a.m. that morning, DECEDENT FOX began the Captain's Drill with the rest of his platoon by performing the required intensive exercises for 90 minutes.

134.    During the intensive exercises defendants PIERCE, KEENAN, BLYTH, CADE, PAPE, and MILLER were present and leading or directing DECEDENT FOX's platoon.

135.    During the exercises DECEDENT FOX began having serious difficulty and fell, cutting both of his knees and causing them to bleed.

136.    As he struggled, defendant BLYTH began to scream at and threaten DECEDENT FOX, at one point yelling, "If you're going to die Fox, just do it now or sign out … you're not going to make it".

137.    During the exercises DECEDENT FOX saw MISKINIS walk by and asked MISKINIS for an Albuterol inhaler.

138.    MISKINIS responded that DECEDENT FOX did not need an inhaler and that if he did not "suck it up", he would be kicked out of the Shock Incarceration Program.

139.    After the extended 90-minute period of intense exercise, DECEDENT FOX's platoon was lined up and told to carry an eight-ounce cup of water over their head across the exercise ground to their formation.

140.    In course of carrying the water over their heads, many of the inmates including DECEDENT FOX spilled half the water or more out of their cups.

141.    At that time the inmates were ordered to drink whatever water remained in their cup; no refills were allowed and any inmate that spilled water was not allowed to get more.

142.    This was the only water DECEDENT FOX or his platoon would receive after during the Captain's Drill that morning.

143.    Afterwards the platoon was lined up in formation and began a three-mile run through Camp Summit.

144.    About half-way through the run the inmates were required to run up and down a steep hill with a severe grade twice; after the second time the inmates completed the run by heading back to the Correctional Facility administration center from which they came.

145.    As the inmates began the run, KEENAN, MILLER, BLYTH, CADE, and PAPE ran in and among the inmates, encouraging the inmates by screaming verbal abuse and occasionally shoving the inmates in the back.

146.    Defendant PIERCE drove a chase vehicle closely behind the platoon at this time.

147.    Immediately DECEDENT FOX began having difficulty and his ankle injury was causing him to limp noticeably when he fell back from the group.

148.    MILLER, BLYTH, CADE, and PAPE fell back with DECEDENT FOX while KEENAN continued to lead the platoon formation from the front.

149.    MILLER, BLYTH, CADE, and PAPE yelled threats and verbal abuse at DECEDENT FOX and then slapped and/or smacked DECEDENT FOX in the back of the head while KEENAN watched.

150.    On the way to the hill MILLER, BLYTH, CADE, and PAPE shoved DECEDENT FOX into the ground face-first two or more times while KEENAN observed.

151.    Each time DECEDENT FOX was shoved to the ground, he slowly got up and continued the run.

152.    When DECEDENT FOX made it to the hill, he proceeded up and down the hill twice.

153.    After climbing the hill once, DECEDENT FOX told the passing inmates in his platoon he didn't think he was going to make it.

154.    When DECEDENT FOX arrived at the bottom of the hill for the second time, MILLER, BLYTH, CADE, and PAPE shoved him again causing him to fall to the ground while KEENAN watched.

155.    While lying on the ground, DECEDENT FOX told MILLER, BLYTH, CADE, and PAPE that he couldn't breathe.

156.    At this time PIERCE exited the chase vehicle, which was a few feet away from DECEDENT FOX, and approached DECEDENT FOX.

157.    After DECEDENT FOX told the Corrections Officers he couldn't breathe, PIERCE, MILLER, BLYTH, CADE, and PAPE slapped DECEDENT FOX in the head while he lay on the ground.

158.    BLYTH yelled, "you're lazy … get your fat ass up."

159.    The rest of DECEDENT FOX's platoon was about 150 to 200 yards in front of the DECEDENT at this time and some of the inmates began clapping for FOX to encourage him.

160.    PIERCE, MILLER, BLYTH, CADE, and PAPE yelled, "Don't you clap for that piece of shit."

161.    At that time BLYTH yelled at DECEDENT FOX, "Get up you fat ass … what are you doing you idiot?", and then PIERCE, KEENAN, MILLER, BLYTH, CADE, and PAPE grabbed DECEDENT FOX by the shirt, lifted his shoulders and forced DECEDENT FOX to continue running.

162.    At this point DECEDENT FOX was almost entirely covered in dirt and his knees were bleeding.

163.    DECEDENT FOX got up and stumbled forward a few paces when PIERCE, KEENAN, MILLER, BLYTH, CADE, and PAPE violently shoved him in the back once again, which caused DECEDENT FOX to fall face forward onto the ground once more.

164.    At this point DECEDENT FOX told PIERCE, KEENAN, MILLER, BLYTH, CADE, and PAPE once again that he couldn't breathe.

165.    In response, PIERCE, KEENAN, MILLER, BLYTH, CADE, and PAPE then kicked DECEDENT FOX as he was lying on the ground.

166.    PIERCE ordered DECEDENT FOX to get up and continue running.

160.    When DECEDENT FOX did not respond by getting on his feet, PIERCE, KEENAN, MILLER, BLYTH, CADE, and PAPE slapped him in the head numerous times and then kicked him again a second time.

167.    At this time, PIERCE, KEENAN, MILLER, BLYTH, CADE, and PAPE all had their personal water bottles with them.

168.    The rest of DECEDENT FOX's platoon was ordered to face forward, away from where the DECEDENT lay and were told to "mind their own business."

169.    After being kicked and slapped, DECEDENT FOX attempted to roll away from the Corrections Officers on the trail and ended up in a small embankment a few feet from the road.

170.    At that time, the rest of the platoon was ordered by MILLER to return to the administrative building to finish the run; they did so forthwith.

171.    After a few minutes, MILLER conceded that DECEDENT FOX was having difficulty and radioed in for medical personnel to report to where DECEDENT FOX lay.

172.    At no time before or after did PIERCE, KEENAN, MILLER, BLYTH, CADE, and PAPE, or any other Corrections Officer give DECEDENT FOX a drink of water from their water bottles.

173. Corrections Officer "R. CROSS JR." ("CROSS') responded to MILLER's call for assistance by driving the facility's Fire & Safety Officer van to DECEDENT FOX's location.

174. When CROSS arrived at DECEDENT FOX's location, he saw DECEDENT FOX lying on the road and did an immediate medical assessment, where he noted DECEDENT FOX's pulse was over 175 bpm and his respirations were very shallow.

175. At that time MILLER radioed in a request for 911 to be called and an ambulance summoned.

176. Corrections Officer "LIEUTENANT PLEW" received MILLER's radio request and called 911 to summon EMS at approximately 12:35 p.m.

177. A few minutes after that point, MILLER radioed in a request for the Fire and Safety Officer to call 911 and request an ambulance.

178. MISKINIS and FEDERICO were driven to the scene by Corrections Officer "WTO PERRY" and arrived at approximately 12:45 p.m. along with several Corrections Officers including "SERGEANT MOREY".

179. At that time DECEDENT FOX was thrashing about, flailing his arms and legs at the Corrections Officers and attempting to bite them.

180. With help from PIERCE, CROSS, MILLER, CADE, PAPE, and BLYTH, MISKINIS forced DECEDENT FOX into a sled-type stretcher and obtained his vital signs.

181. MISKINIS and FEDERICO applied cooling pads to various parts of DECEDENT FOX's body and also supplied oxygen.

182.    At approximately 1:20 p.m. an ambulance arrived and transported DECEDENT FOX to Basset Hospital of Schoharie County.

183.    Until the time the ambulance departed Summit Correctional Facility at approximately 1:30 p.m., DECEDENT FOX remained conscious, his eyes open and his arms and legs moving.

184.    At approximately 4:12 p.m. DECEDENT FOX was transported to Cooperstown Hospital where he was placed in the ICU.

185.    Two days later on August 14, 2009, DECEDENT FOX succumbed to his injuries and passed away.

186.    As a result of the foregoing unlawful acts by the defendants, DECEDENT FOX suffered extensive physical and mental injuries including apprehension of impending death, conscious pain, and suffering; DECEDENT FOX was rendered sick, sore, and disabled for two days before ultimately succumbing to his injuries on August 14, 2009.

187.    An autopsy found that the cause of DECEDENT FOX's death was multiple organ failure due to hyperpyrexia ("heat stroke"), due to or as a consequence of excessive marching and exercising in hot weather; other significant conditions that contributed to his death include his prior medical history and chronic ailments, including obesity, history of asthma, drug abuse, and cardiomegaly (see Autopsy of Brandon Jackson, attached hereto as EXHIBIT B and made a part hereof).

188.    Prior to the death of DECEDENT FOX, the defendants conspired to and did deprive DECEDENT FOX of his life as would shock the conscious in violation of his

rights as guaranteed by the Fifth and Fourteenth Amendments to the United State Constitution.

189.    The defendants also deprived DECEDENT FOX of his right to be free of cruel and unusual treatment as guaranteed by the Eighth Amendment of the United States Constitution. DECEDENT FOX's rights were violated by defendants by use of brutal, excessive, unreasonable and unnecessary physical force upon the DECEDENT.

190.    Defendants' deliberate indifference, recklessness, and medical malpractice proximately resulted in the death of DECEDENT FOX and injured the plaintiffs.

191.    Defendants were reckless and grossly negligent in that they created or allowed to continue a custom or policy which failed to provide proper training to correctional officers and wardens operating the DOCS Shock Incarceration Program, or properly screen candidates for the same.

192.    By reason of the intentional, willful, reckless and malicious conduct of defendants, the plaintiffs are entitled to recover punitive damages.

**FIRST CAUSE OF ACTION**
Violation of 42 U.S.C. § 1983
Eighth Amendment: Deliberate Indifference

193.    Plaintiffs incorporate by reference all of the foregoing allegations.

194.    DECEDENT FOX was taken to Ulster Correctional Facility on or about June 23, 2009.

195.    On that date defendant SHUMAN completed a full medical history which recorded that DECEDENT FOX was diagnosed with asthma as a child and had past hospitalizations due to asthma; SHUMAN also recorded that Fox had past surgery on his

right shoulder, a fracture and surgical repair of his right hip with open reduction internal fixation pins in place, and past fractures of fingers both wrists, and ankles.

196.    After SHUMAN's medical history was completed, an asthma assessment of DECEDENT FOX was done later that day by SHUMAN at approximately 7 p.m.

197.    However, despite the exam which she performed herself just a few hours beforehand, SHUMAN documented that DECEDENT FOX has no history of asthma hospitalization when in fact DECEDENT FOX had told her he had been hospitalized.

198.    Additionally, SHUMAN recorded that DECEDENT FOX's last asthma attack occurred in 2004 despite the fact that SHUMAN herself had personally documented his complaints of asthmatic signs and symptoms just hours before on the same day.

199.    At approximately 8:55 a.m. the next day, June 24, 2009, DECEDENT FOX again appeared at sick call complaining of asthma symptoms.

200.    At that time DECEDENT FOX was seen by defendant MILOV who recorded a diagnosis of mild intermittent asthma, noted that patient education was given, and told DECEDENT to continue to use his Albuterol MDI inhaler.

201.    Later the same day, June 24, 2009, defendant MILOV examined DECEDENT FOX and completed his DOCS Medical Classification

202.    During that exam, MILOV noted that the DECEDENT had bilateral hip surgery at the age of 12, that he was obese and had mild intermittent asthma.

203.    DECEDENT FOX was labeled medical classification "3" by MILOV when in fact his history of asthma hospitalization, morbid obesity, enlarged heart, and chronic pulmonary problems should have placed DECEDENT FOX in the heightened

medical classification "1" or "2" according to the DOCS's own Medical Classification Policy.

204.    SHUMAN and MILOV ignored DOCS medical guidelines and documented DECEDENT FOX as being healthier than he was.

205.    SHUMAN and MILOV had personal knowledge that DECEDENT FOX's health was precarious and that he suffered from serious illness, yet they were deliberately indifferent in documenting and qualifying DECEDENT FOX as an inmate with a low medical risk.

206.    On July 8, 2009, DECEDENT FOX was medically screened for entry into the Shock Incarceration Program by the Ulster Correctional Facility Health Services Director, defendant MAKRAM.

207.    MAKRAM examined DECEDENT FOX at that time and determined that DECEDENT FOX had no asthma since 1996, despite the fact that SHUMAN had documented DECEDENT FOX had asthma in 2004, and despite the fact that DECEDENT FOX had reported to MAKRAM's own staff five times in the previous seven days complaining of asthmatic signs and symptoms.

208.    When screening DECEDENT FOX into the Shock Incarceration Program, MAKRAM reported that DECEDENT FOX did not use Albuterol to control his asthma, despite the fact that his Albuterol use was plainly documented by MAKRAM's own staff no fewer than five times in the previous seven days, and despite the fact that MAKRAM's own staff prescribed and supplied DECEDENT FOX with an Albuterol MDI just six days before.

209.   In screening DECEDENT FOX for the Shock Incarceration Program, MAKRAM did not consult DECEDENT FOX's DOCS medical records, the notes of MAKRAM's own staff, DECEDENT FOX's DOCS electronic pharmacy profile, nor did interview DECEDENT FOX or conduct an investigation of any kind with respect to his serious illnesses.

210.   MAKRAM was consciously aware of DECEDENT FOX's precarious health, including his asthma and obesity, yet completely disregarded the risks to DECEDENT FOX's health when conducting and documenting the Shock Incarceration Program screening.

211.   Despite DECEDENT FOX's serious medical needs and multiple illnesses and injuries, including obesity, concurrent asthma symptoms and documented Albuterol use, MAKRAM cleared DECEDENT FOX for entrance into the DOCS Shock Incarceration Program.

212.   When DECEDENT FOX arrived at Lakeview Correctional Facility, defendant COLVIN performed an intrasystem transfer health-screening, in which COLVIN noted DECEDENT FOX was medically classified as 3, suffering from asthma, had bilateral hip screws, and he was currently taking Albuterol for asthma control.

213.   At the same time or shortly thereafter on July 9, 2009 COLVIN and defendant WILCOX performed a second health screening for inclusion into the DOCS Shock Incarceration Program.

214.   COLVIN and WILCOX documented that DECEDENT FOX suffered from asthma, had a Peak Flow of 720, and had no recent Albuterol MDI use

215.     In screening DECEDENT FOX for inclusion in the Shock Incarceration Program, COLVIN and WILCOX concluded DECEDENT FOX had no Albuterol use despite the fact that only an hour before COLVIN documented DECEDENT FOX's concurrent Albuterol MDI use during his intrasystem transfer exam.

216.     When screening DECEDENT FOX for inclusion in the Shock Incarceration Program, neither COLVIN nor WILCOX questioned or considered that DECEDENT FOX's current Peak Flow of 720 was reduced 20 percent from his normal level as documented on his Asthma Rescue Treatment Plan.

217.     Despite DECEDENT FOX's serious illnesses of which they were consciously aware, both WILCOX and COLVIN recommended DECEDENT FOX for the DOCS Shock Incarceration Program.

218.     In approving DECEDENT FOX's medical suitability for the DOCS Shock Incarceration Program, neither COLVIN nor WILCOX checked his past medical records, charts, or health reports.

219.     In approving DECEDENT FOX's medical suitability for the DOCS Shock Incarceration Program, neither COLVIN nor WILCOX checked DOCS electronic pharmacy records to determine whether DECEDENT FOX was currently prescribed medications such as Albuterol, despite the fact that it was and is stated DOCS policy to do so.

220.     While at Lakeview Correctional Facility, DECEDENT FOX's application to the Shock Incarceration Program was reviewed by JOHN DOE 1 and JOHN DOE 2, members of the Lakeview Shock Incarceration Selection Committee.

221.     Defendants JOHN DOE 1, JOHN DOE 2, COLVIN, and WILCOX had the authority to order DECEDENT FOX to complete the Shock Incarceration Program at Lakeview Correctional Facility – a facility well staffed and capable of providing treatment to inmates with serious health problems such as DECEDENT FOX.

222.     Additionally, JOHN DOE 1, JOHN DOE 2, COLVIN, and WILCOX all had authority to limit DECEDENT FOX's physical activity in the Shock Incarceration Program or otherwise order reasonable accommodations to protect his health; none of the defendants did so.

223.     In violation of DOCS policy, JOHN DOE 1, JOHN DOE 2, COLVIN, and WILCOX directed DECEDENT FOX to complete the Shock Incarceration Program at Summit Correctional Facility, a "camp" that is unequipped to host inmates with serious chronic health problems like those suffered by DECEDENT FOX, including weekly asthma attacks or symptoms, an enlarged heart, morbid obesity, and pulmonary problems.

224.     On or about July 30, 2009 DECEDENT FOX was transferred to Summit Correctional Facility.

225.     At that time, MISKINIS and FEDERICO were the sole medical personnel at the camp.

226.     Between July 30, 2009 and August 12, 2009, DECEDENT FOX complained to MISKINIS and FEDERICO at least six times about suffering asthmatic signs and symptoms.

227.     During this period MISKINIS and FEDERICO had authority to limit DECEDENT FOX's physical activity in the Shock Incarceration Program or otherwise order reasonable accommodations to protect his health; neither did so.

228.    During this period MISKINIS and FEDERICO were consciously aware of DECEDENT FOX's serious illnesses including morbid obesity, asthma, enlarged heart, and other pulmonary problems.

229.    After DECEDENT FOX's Albuterol MDI was confiscated by BUNNEY, MISKINIS and FEDERICO refused to either return the inhaler or prescribe and supply DECEDENT FOX with a new Albuterol MDI.

230.    DECEDENT FOX's condition continued to worsen and by the morning of August 3, 2009, MISKINIS and FEDERICO measured DECEDENT FOX's Peak Flow at 500, a decrease of 40 percent of normal as documented on his Asthma Rescue Treatment Plan.

231.    However, MISKINIS and FEDERICO continued to characterize DECEDENT FOX's dangerously low Peak Flow as "good" and provided no Albuterol MDI or any treatment whatsoever.

232.    On August 5, 2009 DECEDENT FOX was seen by MCPHILLIPS at Hale Creek Correctional Facility to address his asthma complaints.

233. While at Hale Creek Correctional Facility, a nurse recorded DECEDENT FOX's Peak Flow rates at 360, 380, and 370. These Peak Flow rates were respectively about 60 percent, 58 percent, and 59 percent below the Peak Flow of 900 recorded on DECEDENT FOX's Asthma Rescue Treatment Plan.

234.    After examining DECEDENT FOX, reviewing his medical history, seeing his dangerously reduced Peak Flow rates, and referencing DECEDENT FOX's Asthma

Rescue Treatment Plan, MCPHILLIPS documented that DECEDENT FOX had no current asthmatic signs or symptoms.

235.    At that time MCPHILLIPS made no documentation as the whether DECEDENT FOX's symptoms were getting worse, better, or were stable.

236.    At that time MCPHILLIPS never asked DECEDENT FOX why he was using such a large amount of Albuterol nor did MCPHILLIPS address FOX's dangerously reduced Peak Flow rates.

237.    After MCPHILLIPS examined DECEDENT FOX he diagnosed FOX as having mild intermittent asthma, but refused to renew the prescription for Albuterol or issue a new one for anti-inflammatory medication.

238.    At that time, MCPHILLIPS was consciously aware of DECEDENT FOX's serious illnesses, including his perilously low Peak Flow rates, morbid obesity, enlarged heart, asthma, and pulmonary problems.

239.    Despite MCPHILLIPS's awareness of DECEDENT FOX's condition, he provided no treatment whatsoever, ordered no exercise limitation or reasonable accommodation, and was deliberately indifferent to the unreasonable risks to DECEDENT FOX's health and safety.

240.    When DECEDENT FOX was injured during the Captain's Drill run at about 12:30 p.m. on August 12, 2009, MISKINIS and FEDERICO responded to supply emergency first aid.

241.    The Summit Correctional Facility has a Heat Injury Prevention Policy which calls for providing a patient with water immediately upon the outset of hyperthermia symptoms.

242.    In violation of the Heat Injury Prevention Policy, neither MISKINIS nor FEDERICO supplied DECEDENT FOX with water as he suffered from hyperthermia.

243.    From approximately June 23, 2009 until his death on August 14, 2009, DECEDENT FOX suffered from objectively serious illnesses and injuries including diabetes, asthma, cardiac problems, obesity, healed hip fractures with pinning, and other serious conditions.

244.    From approximately June 23, 2009 until his death on August 14, 2009, DECEDENT FOX's serious medical needs were ones that had been diagnosed by a physician as requiring treatment and were so obvious that even a lay person would easily recognize the precariousness of DECEDENT FOX's health.

245.    From approximately June 23, 2009 until his death on August 14, 2009, SHUMAN, WILCOX, MAKRAM, COLVIN, WILCOX, JOHN DOE 1, JOHN DOE 2, MCPHILLIPS, MISKINIS, and FEDERICO unnecessarily and wantonly inflicted harm on the DECEDENT in that they: recklessly ignored or failed to recognize or diagnose DECEDENT FOX's diabetes, obesity, healed hip fractures with pinning, asthma, cardiac problems, and other ailments; recklessly cleared DECEDENT FOX for the DOCS Shock Incarceration Program, knowing that the program consisted of strenuous physical labor in the heat of summer days including forced marches and runs; recklessly cleared DECEDENT FOX for the DOCS Shock Incarceration Program despite the fact that he had serious medical problems and that they knew or should have known that there was no medical staff at the Summit Correctional Facility, but only under-qualified nurses; had actual knowledge of a substantial risk to the life and safety of DECEDENT FOX, yet deliberately and indifferently cleared DECEDENT FOX for the DOCS Shock

Incarceration Program; recklessly and with deliberate indifference failed to test, examine, or observe DECEDENT FOX and failed to diagnose the number of serious medical problems DECEDENT FOX suffered from; recklessly and with deliberate indifference failing to remove DECEDENT FOX from the DOCS Shock Incarceration Program in light of his serious and obvious health problems; recklessly and with deliberate indifference failing to prohibit strenuous activity in hot weather conditions in light of DECEDENT FOX's obvious health problems to; recklessly and with deliberate indifference failing in any way to provide treatment for the serious and chronic medical needs of the DECEDENT; recklessly and with deliberate indifference failing to supply DECEDENT FOX with an additional asthma pump when he reported his lost, despite knowing he would be required to perform arduous physical labor in a precarious state of health; recklessly and with deliberate indifference failing to supply appropriate medical treatment when DECEDENT FOX collapsed on August 12, 2009, including water, asthma medication, CPR, or to otherwise use their medical training to resuscitate DECEDENT FOX; consciously disregarding substantial and unjustifiable risks to the health and life of DECEDENT FOX, and in so doing deviating from the standard of care reasonably expected of medical professionals; recklessly or with callous indifference violated the federally protected right of the DECEDENT to be free of unnecessary and wantonly inflicted harm; all as part of a pattern and practice by the defendants in violation of the constitutional rights of inmates including the decedent.

246.    The reckless conduct and deliberate indifference of SHUMAN, WILCOX, MAKRAM, COLVIN, WILCOX, JOHN DOE 1, JOHN DOE 2, MCPHILLIPS, MISKINIS, and FEDERICO toward DECEDENT FOX violated DECEDENT FOX's

Eighth Amendment right to be free of cruel and unusual punishment and was a proximate cause of DECEDENT FOX's death and the plaintiffs' injuries.

**SECOND CAUSE OF ACTION**
Violation of 42 U.S.C. § 1983
Eighth Amendment: Deliberate Indifference

247.    Plaintiffs incorporate by reference all of the foregoing allegations.

248.    On or about July 30, 2009, DECEDENT FOX arrived at the Summit Correctional Facility to begin the DOCS Shock Incarceration Program.

249.    At that time, defendants MOONEY, BUNNEY, BLYTH, PAPE, CADE, MILLER, PIERCE and KEENAN were working at Summit Correctional Facility as corrections officers under the color of state law.

250.    BUNNEY's, BLYTH's, PAPE's, CADE's, MILLER's, PIERCE's and KEENAN's responsibilities included supervising the inmates during the strenuous physical activities required by the DOCS Shock Incarceration Program.

251.    On or about August 3, 2009 BUNNEY confiscated DECEDENT FOX's Albuterol MDI and never gave it back.

252.    BUNNEY did this knowing that DECEDENT FOX suffered from serious health problems including asthma and obesity.

253.    BUNNEY told DECEDENT FOX that he was confiscating his Albuterol MDI because it was unlabeled

254.    However, at least two other members of DECEDENT FOX's platoon suffered from asthma and also carried unlabeled Albuterol MDI's with them at all times and only DECEDENT FOX was singled out and had his medication confiscated by BUNNEY.

255.    DECEDENT FOX sought out the help of MOONEY and shared his apprehension about continuing the DOCS Shock Incarceration Program.

256.    MOONEY did nothing help DECEDENT FOX other than discuss the possibility of a temporary release and directed DECEDENT FOX to report any issues to the Corrections Officers and Medical Staff despite the fact that DECEDENT FOX had attempted to do exactly that and had found no help whatsoever.

257.    As more fully set forth above, DECEDENT FOX participated in a run the morning of August 12, 2009 that was conducted by BLYTH, PAPE, CADE, MILLER, PIERCE and KEENAN.

258.    At that time BLYTH, PAPE, CADE, MILLER, PIERCE and KEENAN were with DECEDENT FOX.

259.    As more fully set forth above, BLYTH, PAPE, CADE, MILLER and KEENAN repeatedly pushed DECEDENT FOX to the ground and slapped and smacked his head.

260.    Instead of helping DECEDENT FOX, who was slowly suffocating entering the first stages of hyperthermia, BLYTH, PAPE, CADE, MILLER, PIERCE and KEENAN yelled at, threatened, and kicked DECEDENT FOX.

261.    This conduct was malicious and its only purpose was to cause the DECEDENT harm.

262.    MOONEY, BUNNEY, BLYTH, PAPE, CADE, MILLER, PIERCE and KEENAN unnecessarily and wantonly inflicted harm on the DECEDENT by recklessly and with deliberate indifference forcing DECEDENT to engage in strenuous and arduous activities such forced runs up steep hills in hot weather without water despite his obvious

health problems; threatening, taunting, shouting, pushing, assaulting, battering, and knocking to the ground DECEDENT FOX when he complained about his inability to perform arduous physical labor such as forced marches or runs; engaging in patterns of abuse, maltreatment, and cruelty whenever DECEDENT FOX pleaded for rest from the arduous physical labor; hitting, attacking, striking, beating, kicking, punching, and otherwise assaulting and battering DECEDENT FOX repeatedly when he collapsed on August 12, 2009; threatening DECEDENT FOX with handcuffing, violations, additional jail time, solitary confinement, and other negative consequences if he failed to finish the run on August 12, 2009, despite observing DECEDENT FOX's dangerous physical condition; failing to promptly supply emergency medical care or summon emergency medical personnel when DECEDENT FOX collapsed on August 12, 2009; confiscating DECEDENT FOX's asthma pump and refusing to supply a replacement; recklessly and with deliberate indifference failing to remove DECEDENT FOX from the DOCS Shock Incarceration Program in light of the DECEDENT's serious and obvious health problems; failing to prohibit strenuous activity in hot weather conditions in light of DECEDENT FOX's serious and obvious health problems; and consciously disregarding substantial and unjustifiable risks to the health and life of DECEDENT FOX, and in so doing grossly deviating from the standard of care reasonably expected of corrections officers; all as part of a pattern and practice by the defendants in violation of the constitutional rights of inmates including the decedent.

263.    MOONEY, BUNNEY, BLYTH, PAPE, CADE, MILLER, WHITTAKER and KEENAN engaged in reckless conduct and deliberate indifference that was a proximate cause of DECEDENT FOX's death and the plaintiffs' injuries.

### THIRD CAUSE OF ACTION
### Violation of 42 U.S.C. § 1983
### Eighth Amendment: Excessive Force

264.    Plaintiffs incorporate by reference all of the foregoing allegations.

265.    On or about July 30, 2009, DECEDENT FOX arrived at the Summit Correctional Facility to begin the DOCS Shock Incarceration Program.

266.    At that time BLYTH, PAPE, CADE, MILLER, PIERCE and KEENAN were corrections officers at the Summit Correctional Facility whose duties included supervising the inmates in the DOCS Shock Incarceration Program.

267.    From approximately July 30, 2009 until August 12, 2009 and despite DECEDENT FOX's obvious health problems, BUNNEY,  BLYTH, PAPE, CADE, MILLER, PIERCE and KEENAN pushed, assaulted, battered, and knocked to the ground DECEDENT FOX whenever DECEDENT FOX complained about his inability to perform arduous physical labor such as forced marches or runs.

268.    This pattern of abuse, maltreatment, and cruelty occurred whenever DECEDENT FOX pleaded for rest.

269.    Given DECEDENT FOX's physical condition, such aggressive physical force was unnecessary and excessive.

270.    As more fully set forth above, on August 12, 2009, during a forced march in the summer heat, DECEDENT FOX was knocked to the ground by the defendants multiple times and ultimately was unable to get up.

271.    After DECEDENT FOX was unable to sit up or stand, rather than summon emergency medical personnel, BLYTH, PAPE, CADE, MILLER, PIERCE and KEENAN instead pushed, slapped, smacked, and kicked DECEDENT FOX repeatedly.

272.     As more fully set forth above, it wasn't until after DECEDENT FOX rolled off the side of the road that BLYTH, PAPE, CADE, MILLER, PIERCE and KEENAN stopped attacking DECEDENT FOX.

273.     This conduct was malicious and its only purpose was to cause the DECEDENT harm.

274.     BLYTH, PAPE, CADE, MILLER, PIERCE and KEENAN violated the federally protected right of the DECEDENT to be free of cruel and unusual treatment as guaranteed by the Eighth Amendment to the United States Constitution by threatening, taunting, shouting, pushing, assaulting, battering, and knocking to the ground DECEDENT FOX whenever he complained about his inability to perform arduous physical labor such as forced marches or runs; hitting, attacking, striking, beating, kicking, punching, and otherwise assaulting and battering DECEDENT FOX repeatedly when he collapsed on the morning of August 12, 2009; and engaging in malicious patterns of abuse, maltreatment, and cruelty whose only purpose was to cause DECEDENT FOX harm; all as part of a pattern and practice by the defendants in violation of the constitutional rights of inmates including the decedent.

275.     BLYTH, PAPE, CADE, MILLER, PIERCE and KEENAN engaged in excessive force that violated DECEDENT's Eighth Amendment rights and was a proximate cause of DECEDENT FOX's death and the plaintiffs' injuries.

**FOURTH CAUSE OF ACTION**
Violation of 42 U.S.C. § 1983
Eighth Amendment: Failure to Intervene

276.     The plaintiffs incorporate by reference all the foregoing allegations.

277.    The foregoing allegations in this verified complaint establish prima facie violations of the Eighth Amendment's ban on cruel and unusual treatment by among others, BUNNEY, BLYTH, PAPE, CADE, MILLER, PIERCE and KEENAN.

278.    Correction officers and other prison employees have a duty to intervene to prevent the excessive force of another corrections officer[1].

279.    From approximately July 30, 2009 until DECEDENT FOX's collapse on August 12, 2009, NELSON, BUNNEY, BLYTH, PAPE, CADE, MILLER, PIERCE, KEENAN, MISKINIS, and FEDERICO were all in a position to see, to know, or to have cause to know of the excessive force being employed upon DECEDENT FOX.

280.    On August 12, 2009, each and every one of the defendants NELSON, BUNNEY, BLYTH, PAPE, CADE, MILLER, PIERCE, KEENAN, MISKINIS, and FEDERICO had a reasonable opportunity to intervene to prevent or stop the cruel and malicious attack upon DECEDENT FOX.

281.    None of the defendants intervened to stop the excessive force being employed against DECEDENT FOX.

282.    Accordingly, each and every defendant named herein breached DECEDENT FOX's federally protected rights by failing to intervene to prevent the unlawful and excessive force employed against DECEDENT FOX.

283.    Therefore, DECEDENT FOX's right to be free of cruel and unusual punishment as guaranteed by the Eighth Amendment of the United States Constitution was violated by the defendants named herein, proximately resulting in his injury and death.

---

[1] e.g., Smith v. Mensinger, 293 F.3d 641, 650 (3d Cir. 2002).

**FIFTH CAUSE OF ACTION**
Violation of 42 U.S.C. § 1983
Supervisory Liability

284.    The plaintiffs incorporate by reference all the foregoing allegations.

285.    At all relevant times herein, defendant FISCHER was the Commissioner of the New York State Department of Corrections.

286.    FISCHER's duties included, but were not limited to: supervising various programs within the Department of Corrections such as the DOCS Shock Incarceration Program; controlling and supervising the training of Department of Corrections employees such as corrections officers, counselors, and wardens; creating, establishing, and implementing incarceration policies; determining the medical personnel and medical facilities at New York State correctional facilities; and establishing and supervising policies that determine if an inmate is eligible for the DOCS Shock Incarceration Program and where an inmate will participate in that program. He is being sued in his personal capacity.

287.    At all relevant times herein, defendant MOSCICKI was the Superintendant of Lakeview Correctional Facility.

288.    MOSCICKI's duties included, but were not limited to: supervising various programs within the Department of Corrections such as the DOCS Shock Incarceration Program; controlling and supervising the training of Department of Corrections employees such as corrections officers, counselors; creating, establishing, and implementing incarceration policies; determining the medical personnel and medical facilities at Lakeview Correctional Facility; and establishing and supervising policies that

determine if an inmate is eligible for the DOCS Shock Incarceration Program and where an inmate will participate in that program. He is being sued in his personal capacity.

289.    At all relevant times herein, defendant NELSON was the Superintendent of Summit Correctional Facility.

290.    NELSON's duties included, but were not limited to: supervising various programs within the Department of Corrections such as the DOCS Shock Incarceration Program; controlling and supervising the training of Department of Corrections employees such as corrections officers; creating, establishing, and implementing incarceration policies; determining the medical personnel and medical facilities at Summit Correctional Facility; and establishing and supervising policies that determine if an inmate is eligible for the DOCS Shock Incarceration Program and where an inmate will participate in that program. She is being sued in her personal capacity.

291.    Prior to the DECEDENT's collapse at the Summit Correctional Facility, defendants FISCHER, MOSCICKI, and NELSON were reckless and grossly negligent in that they created or allowed to continue a custom or policy which: failed to provide proper training to correctional officers and wardens operating the DOCS Shock Incarceration Program in that BUNNEY, BLYTH, PAPE, CADE, MILLER, WHITTAKER, and KEENAN did not have the training that could be reasonably expected of corrections officers to address injuries such as heat stroke, refrain from assaulting and battering inmates whom are physically unable to complete prolonged and arduous labor; or generally provide the necessary care and protection to inmates as their duty requires; PATTY NELSON, Warden of Summit Correctional Facility, did not have the training that could be reasonably expected of a New York State Correctional Facility

Warden in that she was unable to effectively supervise, train, or restrain the foregoing defendants from engaging in the reckless, malicious, and unlawful conduct set forth above; Corrections Counselors, Nurses, and Doctors did not have the judgment or training reasonably expected of a person required screen inmates for inclusion into physically intensive programs such as the DOCS Shock Incarceration Program; none of defendant's employees had the judgment or training to reasonably limit the strenuous labor required of inmates with serious and obvious medical problems; none of the defendants' employees had the judgment or training to reasonably transfer an inmate with serious and obvious medical problems to a more appropriate facility or program; none of defendant's employees had the judgment or training to reasonably prevent an inmate with serious and obvious medical problems from being transferred to an inappropriate or inadequate facility; none of the medical personnel employed and supervised by the defendants diagnosed, treated, or properly accounted for DECEDENT FOX's serious medical needs including diabetes, asthma, obesity, healed hip fractures with pinning, cardiac problems, and other serious ailments; none of defendants' employees had the judgment or training to reasonably respond to a medical emergency in the DOCS Shock Incarceration Program including to supply emergency medical care, promptly summon emergency medical personnel, or otherwise aid and protect inmates *in extremis*; none of defendant's employees had the judgment or training to reasonably refrain from consciously disregarding substantial and unjustifiable risks to the health and life of DECEDENT FOX, and in so doing grossly deviating from the standard of care reasonably expected of them; they did not prevent corrections officers responsible for operating the DOCS Shock Incarceration Program from routinely engaging in malicious,

sadistic, and abusive assaults and beatings upon inmates; did not train or supervise their employees to provide necessary medication and equipment to inmates such as asthma pumps or to refrain from confiscating the same; did not train or supervise wardens to adequately protect inmates and supervise employees, which allowed the defendants named herein to commit the wrongful acts against the DECEDENT; did not adequately staff and resource the medical clinic at Summit Correctional Facility knowing that a program requiring extended periods of arduous physical labor would create a foreseeable risk of serious and life-threatening injury to inmates, especially those in poor physical health; knew or should have known that injuries at Summit Correctional Facility could be catastrophic and life-threatening, and that a medical clinic inadequately staffed with two nurses and no emergency medical supplies would pose an unreasonable risk to the safety and wellbeing of the inmates; they hired corrections officers manifestly unfit to perform their duties; refused or neglected to discipline corrections officers that engaged in abusive behavior towards inmates; refused or neglected to terminate the employment of corrections officers that engaged in abusive behavior towards inmates; all as part of a pattern and practice by the defendants in violation of the constitutional rights of inmates including the decedent.

292.    FISCHER, MOSCICKI, and NELSON knew or should have known to a moral certainty that their failure to properly train and supervise their employees in implementing the DOCS Shock Incarceration Program would result in exactly the kind and type of wrongful conduct set forth at length in this complaint.

293.    Defendants FISCHER, MOSCICKI, and NELSON intentionally and purposely instituted and continued the Shock Incarceration program in a way designed to

"break down" inmates through a violent, threatening, coercive and militaristic atmosphere, with forced extreme physical training, shouting of threats, imposition of fear, batteries, assaults, arbitrary actions, all causing unreasonable danger to the health of the inmates in said program, including DECEDENT FOX.

294.    Accordingly, DECEDENT FOX's right to be free of cruel and unusual punishment as guaranteed by the Eighth Amendment of the United States Constitution was violated, proximately resulting in his injury and death.

## SIXTH CAUSE OF ACTION
### Assault and Battery

295.    The plaintiffs incorporate by reference all the foregoing allegations.

296.    As more fully set forth above, while at Summit Correctional Facility and in despite of DECEDENT FOX's serious health problems, on the morning of August 12, 2009 he was forced to participate in a morning run.

297.    During the run DECEDENT FOX was slapped, smacked in the head, pushed, and knocked to the ground multiple times by BLYTH, CADE, PATE, MILLER, and PIERCE.

298.    DECEDENT FOX had almost completed the run when he was pushed and knocked to the ground a final time by BLYTH, CADE, PATE, MILLER, and PIERCE.

299.    DECEDENT FOX was unable to get up and told BLYTH, CADE, PATE, MILLER, and PIERCE that he couldn't breathe.

300.    Rather than summon emergency medical personnel, BLYTH, CADE, PATE, MILLER, and PIERCE instead hit and smacked DECEDENT FOX in the head and then kicked him at least twice

301.    DECEDENT FOX was placed in apprehension of imminent bodily harm by BLYTH, CADE, PATE, MILLER, and PIERCE and immediately thereafter did suffer such bodily harm at the hand of said defendants.

302.    It wasn't until some time after DECEDENT FOX had rolled off the side of the road that BLYTH, CADE, PATE, MILLER, and PIERCE stopped attacking, hitting, kicking, striking, and otherwise assaulting and battering DECEDENT FOX.

303.    This conduct was intentional, willful, unwarranted, and had no penological purpose -- its only purpose was to cause the DECEDENT harm.

304.    BLYTH, CADE, PATE, MILLER, and PIERCE committed common-law assault and common-law battery upon DECEDENT FOX by causing him to be placed in apprehension of immediate bodily harm and consciousness of impending death. Thereafter, BLYTH, CADE, PATE, MILLER, and PIERCE engaged in malicious, sadistic, and unlawful force against DECEDENT FOX, proximately causing the death of DECEDENT FOX and the plaintiffs' injuries in violation of the laws and Constitution of the State of New York.

<u>**SEVENTH CAUSE OF ACTION**</u>
<u>Wrongful Death</u>
<u>Negligence</u>

305.    Plaintiffs incorporate by reference all the foregoing allegations.

306.    On August 12, 2009 NELSON, MISKINIS, FEDERICO, BUNNEY, BLYTH, PAPE, CADE, MILLER, MOONEY, PIERCE and KEENAN were DOCS employees at Summit Correctional Facility whose duties included operating the DOCS Shock Incarceration Program and supervising inmates in that program.

307.   It was the duty of NELSON, MISKINIS, FEDERICO, BUNNEY, BLYTH, PAPE, CADE, MILLER, MOONEY, PIERCE and KEENAN to protect the health and wellbeing of the inmates under their control.

308.   During DECEDENT FOX's time at Summit Correctional Facility he had serious medical needs that had been diagnosed by a physician as requiring treatment and were so obvious that even a lay person would easily recognize the precariousness of his health.

309.   At this time it was reasonably foreseeable that DECEDENT FOX's precarious health would be further jeopardized by excessive, prolonged physical labor in hot weather.

310.   Despite DECEDENT FOX's obvious health problems, NELSON, MISKINIS, FEDERICO, BUNNEY, BLYTH, PAPE, CADE, MILLER, MOONEY, PIERCE and KEENAN took no measures to protect DECEDENT FOX from the effects of prolonged and strenuous exercise in the summer heat.

311.   The defendants knew or should have known that DECEDENT FOX's health was in jeopardy and taken measures to protect him from serious injury.

312.   The defendants NELSON, MISKINIS, FEDERICO, BUNNEY, BLYTH, PAPE, CADE, MILLER, MOONEY, PIERCE and KEENAN were negligent in that they did not take measures to protect the health and safety of DECEDENT FOX that can reasonably be expected from corrections officers with a non-delegable duty to protect the same; should have transferred DECEDENT FOX to a location or program more suitable to a person with serious medical issues; should have reduced the amount of arduous physical exercise DECEDENT FOX was subjected to; should have allowed DECEDENT

FOX access to his asthma medication or water during arduous forced labor; should have refrained from assaulting and battering DECEDENT FOX as more fully discussed in the foregoing allegations of this complaint; should have provided emergency medical care when DECEDENT FOX collapsed on August 12, 2009; should have more promptly summoned emergency medical personnel once DECEDENT FOX collapsed; should have transferred DECEDENT FOX to a facility with adequate medical facilities to treat DECEDENT FOX's serious and obvious medical needs; should have transferred DECEDENT FOX to another program which did not require prolonged period of intensive forced labor; should have provided DECEDENT FOX with medication and medical equipment such as an asthma pump; should have refrained from confiscating DECEDENT FOX's asthma pump; recklessly, willfully, wantonly, and negligently exposed DECEDENT FOX to a foreseeable and unreasonable risk of injury and death.

313.    NELSON, MISKINIS, FEDERICO, BUNNEY, BLYTH, PAPE, CADE, MILLER, MOONEY, PIERCE and KEENAN were negligent in the supervision of DECEDENT FOX in the DOCS Shock Incarceration Program. As a result of defendants' negligence, DECEDENT FOX suffered intense torment, anguish, consciousness of impending death, and conscious pain and suffering, and death.

### EIGHTH CAUSE OF ACTION
Wrongful Death
Reckless Conduct

314.    The plaintiffs incorporate by reference all the foregoing allegations

315.    NELSON, MISKINIS, FEDERICO, BUNNEY, BLYTH, PAPE, CADE, MILLER, PIERCE and KEENAN were grossly negligent, wanton, and reckless in their supervision of DECEDENT FOX in the DOCS Shock Incarceration Program.

316.    NELSON, MISKINIS, FEDERICO, BUNNEY, BLYTH, PAPE, CADE, MILLER, PIERCE and KEENAN consciously disregarded substantial and unjustifiable risks to the health and life of DECEDENT FOX and in so doing grossly deviated from the standard of care reasonably expected of them.

317.    As a result of defendants' conduct, DECEDENT FOX suffered intense torment, anguish, consciousness of impending death, conscious pain and suffering and death.

318.    The defendants named herein acted recklessly and as a result of their unreasonable conduct, caused DECEDENT FOX to be proximately injured and killed.

**NINTH CAUSE OF ACTION**
Wrongful Death
Medical Malpractice

319.    The plaintiffs incorporate by reference all of the foregoing allegations.

320.    SHUMAN, WILCOX, MAKRAM, COLVIN, WILCOX, JOHN DOE 1, JOHN DOE 2, MISKINIS and FEDERICO were at all relevant times medical personnel employed by DOCS

321.    At all relevant times MCPHILLIPS was a medical doctor who performed contract work for DOCS at various correctional facilities, including Hale Creek Correctional Facility

322.    MCPHILLIPS was not and is not a DOCS employee or otherwise an employee of the State of New York.

323.    The duties of SHUMAN, WILCOX, MAKRAM, COLVIN, WILCOX, JOHN DOE 1, JOHN DOE 2, MCPHILLIPS, MISKINIS, and FEDERICO included

supervising the medical needs of inmates and screening candidates for the DOCS Shock Incarceration Program.

324.    From approximately June 23, 2009 until August 12, 2009 DECEDENT FOX was under the medical care of SHUMAN, WILCOX, MAKRAM, COLVIN, WILCOX, JOHN DOE 1, JOHN DOE 2, MCPHILLIPS, MISKINIS, and FEDERICO at their various correctional facilities.

325.    As more fully set forth above, despite DECEDENT FOX's myriad health issues, SHUMAN, WILCOX, MAKRAM, COLVIN, WILCOX, JOHN DOE 1, JOHN DOE 2, MCPHILLIPS, MISKINIS, and FEDERICO cleared DECEDENT FOX for the DOCS Shock Incarceration Program.

326.    As more fully set forth above, in screening DECEDENT FOX for the DOCS Shock Incarceration Program SHUMAN, WILCOX, MAKRAM, COLVIN, WILCOX, JOHN DOE 1, JOHN DOE 2, MCPHILLIPS, MISKINIS, and FEDERICO failed to examine DECEDENT FOX's medical history, examine their own notes and observations, account for DECEDENT FOX's dangerously low Peak Flow rates, check DOCS electronic pharmacy records, or otherwise make a reasonable attempt to evaluate the risks posed by DECEDENT FOX's inclusion into the DOCS Shock Incarceration Program.

327.    It was reasonably foreseeable that DECEDENT FOX's objectively verifiable health issues combined with excessive and prolonged physical labor in hot weather posed an unreasonable risk to the health and safety of DECEDENT FOX.

328.    It was reasonably foreseeable that denying DECEDENT FOX's repeated request for a refill or re-prescription of his Albuterol MDI in light of his repeated

complaints of asthmatic symptoms after intensive exercise posed an unreasonable risk to the health and safety of DECEDENT FOX.

329.    The defendants named herein were negligent in: that they knew or should have known the precarious state of DECEDENT FOX's health and transferred him out of the DOCS Shock Incarceration Program; should have declined to clear DECEDENT FOX for transfer o Summit Correctional Facility, which had inadequate medical resources for someone with DECEDENT FOX's health problems; defendants sent DECEDENT FOX to a facility which they knew had limited and inadequate medical resources to treat someone with DECEDENT FOX's medical problems or care for him in the event of an emergency; in failing to test, examine, diagnose and provide treatment for DECEDENT FOX's myriad health problems; failing to prevent or limit the arduous physical exercise imposed on DECEDENT FOX by the corrections officers; failing to provide any medical care whatsoever to DECEDENT FOX despite his obvious medical needs; in failing to resuscitate or provide emergency medical treatment or first aid to DECEDENT FOX when he collapsed on August 12, 2009; failing to promptly summon emergency medical personnel when DECEDENT FOX collapsed on August 12, 2009; failing to secure and provide DECEDENT FOX with an asthma pump; in failing to provide the standard of care reasonably expected of licensed medical professionals; in conducting themselves imprudently, unreasonably, and negligently in their care and evaluation of DECEDENT FOX; defendant's malpractice was set forth in the attached report of  Phyllis Harrison-Ross, a medical doctor, on behalf of the New York State Commission of Correction, and the attached medical examiner's report of Robin Eastman-Abaya, a medical doctor.

330.    As a result of the foregoing negligence and deliberate indifference of the defendants, DECEDENT suffered physical injuries, apprehension of impending death, conscious pain and suffering, and mental distress and died on August 14, 2009.

## TENTH CAUSE OF ACTION
### Violation of 42 U.S.C. § 1985(3)
### Conspiracy to Violate Civil Rights

331.    The plaintiffs incorporate by reference all of the foregoing allegations.

332.    Defendants FISCHER, MOSCICKI, and NELSON operated the DOCS Shock Incarceration Program in such a manner as to know that inmates in the program, including DECEDENT FOX, were regularly and systematically deprived of their Eighth Amendment right to be free of cruel and unusual treatment.

333.    Defendants FISCHER, MOSCICKI, and NELSON instituted or continued policies designed to increase the amount of inmates in the Shock Incarceration Program, including DECEDENT FOX, regardless of whether they were suited for said program, because said program was thought to be less expensive to the State of New York than otherwise incarcerating inmates or alternative programs, and because said program was politically popular, despite New York State regulation(s) and/or law(s) requiring the Department of Corrections to offer an alternative program to Shock Incarceration for inmates with physical infirmities.

334.    Defendants FISCHER, MOSCICKI, and NELSON knowingly conspired to deprive inmates, including DECEDENT FOX,  of their constitutional rights in a manner that shocks the conscience because they knew for a fact that they were violating said inmates', including DECEDENT FOX's, basic rights but chose for political, economic and personal advantage to so anyway.

335.   As a result of the foregoing conspiracy of the defendants to deprive DECEDENT FOX of his civil rights, DECEDENT FOX suffered a loss of said civil rights, as well as physical injuries, consciousness of impending death, conscious pain and suffering, and mental distress from on or about August 1, 2009 up and until his death on August 14, 2009.

**WHEREFORE**, Plaintiffs demand a trial by jury of the causes of action alleged herein and judgment against the defendants for:

(1) pecuniary damages of $2 million;

(2) non-pecuniary damages for apprehension of impending death and conscious pain and suffering of $6 million;

(3) non-pecuniary damages for loss of parental guidance and support in the sum of $5 million;

(4) punitive damages in a sum of $6 million;

(5) reasonable attorney's fees; and

(6) the costs and disbursements of this action.


Yours, etc.,

ERIC BUCKVAR, ESQ.
LAW OFFICE OF MORTON BUCKVAR
*Attorney for Plaintiffs*
305 Broadway, Suite 518
New York, New York 10007
(212) 962-2173